UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ABBOTT LABORATORIES, INC., an Illinois corporation,<br><br>Plaintiff,<br><br>v.<br><br>BIOVALVE TECHNOLOGIES, INC., a Delaware corporation,<br><br>Defendant. | No. 07 C 2094<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Abbott Laboratories, Inc. ("Abbott") filed a breach of contract action against BioValve Technologies, Inc. ("BioValve") on April 16, 2007. BioValve moved to dismiss Abbott's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) on August 27, 2007, contending that the court lacks personal jurisdiction over it. For the reasons explained below, the court denies BioValve's motion.

## FACTUAL BACKGROUND

The court draws the factual background of this case primarily from the parties' affidavits. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (citing, inter alia, *Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1123 (7th Cir. 1983)). All disputes of relevant fact or conflicts in the affidavits will be resolved in favor of the plaintiff. *Id.*

Abbott is an Illinois corporation with its principal place of business in Abbott Park, Illinois. (Compl. ¶ I.A.) BioValve is a Delaware corporation with its principal place of business in Shrewsbury, Massachusetts. (Compl. ¶ I.B.) There is no dispute that–as BioValve's President and CEO Robert Gonnelli has attested–BioValve has no offices in Illinois, no manufacturing facilities in Illinois, no employees employed in Illinois, no Illinois bank account, and no Illinois telephone number. (Docket Entry No. 17, Gonnelli Aff. ¶¶ 1, 3.) BioValve is not licensed to conduct business in Illinois and does not regularly conduct business in Illinois. (*Id.* ¶ 3.) It does not solicit business

or advertise in Illinois.  (*Id.*)  Aside from this litigation, BioValve has never been named as a party to an action in Illinois.  (*Id.* ¶ 5.)  The parties therefore dispute whether this court has jurisdiction to adjudicate Abbott's breach of contract claim against BioValve.

Apparently, BioValve's only contact with the state of Illinois is related to the contract at issue in this lawsuit.  Early in 2005, Deborah Davis–Abbott's Program Manager of Global Pharmaceutical Research and Development ("GPRD"), Process Research and Process Development–identified several potential Abbott customers in the Research Triangle Park area of North Carolina.  (Docket Entry No. 24, Davis Aff. ¶¶ 1, 4.)  One of these potential customers was DarPharma, Inc., a virtual company with no research and development facilities of its own.  (*Id.* ¶¶ 4-5.)  Prabha Fernandes, a former Abbott employee, headed DarPharma.  (*Id.* ¶ 5.)  Despite DarPharma's lack of research and development facilities, Davis "was told that DarPharma was developing a compound known as DAR-0100," which was structurally similar to a previous Abbott development product.  (*Id.* ¶ 6.)  David E. Nichols, a Purdue University professor, developed the molecule that underlies DAR-100.  (Docket Entry No. 28, Gonnelli Supp. Aff. ¶ 2.)  BioValve licenses the DAR-100 molecule, but it pays the licensing fees pursuant to a licensing agreement that originally ran between Purdue University and DarPharma rather than directly to Nichols.  (*Id.* ¶ 3.)

After receiving additional information about DAR-0100, on March 31, Abbott submitted a proposal to Fernandes, in which Abbott proposed to prepare one kilogram of DAR-0100.  (Davis Aff. ¶ 7.)  In April 2005, Fernandes told Davis that DarPharma would work with BioValve on the DAR-0100 project, that BioValve would review Abbott's proposal, and that BioValve would pay for Abbott's work.  (*Id.* ¶ 8.)  The parties have provided no further explanation of the relationship between DarPharma and BioValve, but it is clear that BioValve became active in the DAR-0100 project in the spring of 2005.  Abbot sent several versions of its proposal to DarPharma, and BioValve reviewed them.  (*Id.* ¶ 9.)  Between April 4 and July 18, Davis discussed changes and revisions to the proposal over e-mail and in a June 21 meeting with Fernandes.  (*Id.*)  On July 18,

2

2005, Davis submitted the final proposal to BioValve. (*Id.* ¶ 10.) On August 2, Davis on behalf of Abbott, Fernandes on behalf of DarPharma, and at least five BioValve managers met in Massachusetts to establish expectations for the DAR-0100 project. (*Id.* ¶¶ 11-12.)

As explained above, BioValve was to pay for Abbott's work on the DAR-0100 project. On July 22, 2005, Edward O'Keefe–an Abbott Senior Financial Analyst supporting the GPRD Division–called and e-mailed BioValve to request a purchase order. (Docket Entry No. 23, O'Keefe Aff. ¶¶ 1, 4.) On July 29, Michele Carter–a BioValve employee–sent O'Keefe a purchase order by e-mail, which O'Keefe deemed consistent with "the proposal." (O'Keefe Aff. ¶ 5.) Bob Gonnelli and Jim Patzke approved the Purchase Order, which is for "Process Development & Manufacture of Chiral API (1kg)" at a unit price of $590,000. (Ex. 1 to O'Keefe Aff., E-mail from O'Keefe to Davis of 8/1/05.) Gonnelli is BioValve's President and CEO, while Patzke is BioValve's Director of Quality. (Davis Aff. ¶ 11; Gonnelli Aff. ¶ 1.) For jurisdictional purposes, it is significant to note that there is no suggestion that the Purchase Order contained a choice of law provision, that the Purchase Order contained a choice of jurisdiction provision, or that BioValve has entered into any other contracts with Abbott.

Abbott has facilities, among other places, in both Illinois and Massachusetts. BioValve's President and CEO claims that "[w]hen Biovalve first approached Abbott about producing the DAR-100A, Biovalve was well aware of the existence of Abbott's Worcester [Massachusetts] facility."[1] (Gonnelli Aff. ¶ 7.) Nevertheless, BioValve acknowledges that it had "no role" in selecting which Abbott facility would produce the DAR-100A. (*Id.* ¶ 9.) Davis' project team began working on the DAR-0100 project in early August 2005. (Davis Aff. ¶ 13.) Abbott "unilaterally" selected its North Chicago, Illinois facility as the location for all research, development, manufacture, and storage of DAR-0100. (Gonnelli Aff. ¶ 10; Davis Aff. ¶ 28.) Wayne Pritts and Dan Plata–both Abbott Senior

---

[1] As it is unclear what difference, if any, there is between DAR-0100 and DAR-0100A, the court assumes that any difference between the compounds is insignificant in this context.

Group Leaders of GPRD Process Research and Development–were members of the project group working on the synthesis of DAR-0100. (Docket Entry No. 26, Pritts Aff. ¶¶ 1-4; Docket Entry No. 25, Plata Aff. ¶ 1-4.) Pritts and Plata have confirmed that all analytical method developing and testing as well as production of DAR-0100 occurred at Abbott's North Chicago facility. (Pritts Aff. ¶ 5; Plata Aff. ¶¶ 5, 11.) Abbott's Worcester facility was "in no manner" involved with the DAR-0100 project. (Davis Aff. ¶ 29.)

Beginning in August 2005, Abbott was in direct communication with DarPharma regarding the DAR-0100 project. Until the end of December 2005, Davis, Fernandes, and Nichols–the developer of the molecule underlying DAR-100–conducted all communications related to the DAR-0100 project. (Davis Aff. ¶ 14.) No further details have been provided about where these communications originated, how frequent they were, or when they took place, but both Abbott and BioValve apparently agree that BioValve was not in direct communication with Abbott about the DAR-0100 project at this stage.[2] Then, on December 20, 2005, Fernandes advised Davis that she was resigning on December 31. (Davis Aff. ¶ 15.) Fernandes told Davis to communicate, in the future, with Scott Huie of BioValve. (*Id.*) Thus, Abbott and BioValve began communicating directly with one another in 2006.

On two occasions in 2006, BioValve employees also visited the Abbott facilities in North Chicago, Illinois. Huie and Davis set up the first meeting in January 2006, with the Abbott project team, Huie, and one other BioValve representative. (Davis Aff. ¶¶ 16-17.) In an e-mail to Davis, Huie describes the purpose of the meeting as being to "review the status of the DAR 100A

---

[2] According to Gonnelli, Nichols' role was to offer suggestions to overcome the difficulties Abbott had in synthesizing the DAR-100 molecule. (Gonnelli Supp. Aff. ¶ 5.) There is a dispute as to whether Nichols was a consultant to BioValve in connection with this project. (Compare Davis Aff. ¶ 14 (Nichols was a consultant to BioValve on the project) with Gonnelli Supp. Aff. ¶ 4 (Nichols was never a paid consultant to BioValve).) While the court may resolve all disputes of fact in Abbott's favor in ruling on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the court need not resolve the dispute to decide this motion and therefore will for these purposes assume that Nichols was not a paid employee, contractor, or consultant for BioValve.

synthesis" and to "audit the facility and procedures and review specifications based on [Abbott's] small batch run results." (Ex. 1 to Davis Aff., E-mail from Huie to Davis without identifying header information.) According to his e-mail, Huie expected the meeting to last for at least five hours. (*Id.*) At the meeting, Plata, on behalf of Abbott, presented to BioValve the DAR-0100 project status and proposed timeline for completion. (Plata Aff. ¶¶ 8-9.) Plata never mentioned Abbott's Massachusetts facility, or any non-Illinois facility, during his presentation. (*Id.* ¶ 11) As a part of the January 2006 visit to Abbott's Illinois facilities, on January 9, 2006, BioValve employees Patzke and Huie conducted a "customer audit" of Abbott's North Chicago production facility and provided a detailed report. (Davis Aff. ¶ 18.)[3] Huie's e-mail does not make clear to whom the report was provided, but Abbott asserts that it was given to Davis. (Pl.'s Opp. at 8.) Following the meeting, Davis and her team advised BioValve employees that the project would not be complete until late April and agreed to provide BioValve with regular updates regarding the project. (Davis Aff. ¶ 19.)

BioValve's employees made a second trip to Illinois almost three months later. On March 29, 2006, Huie, Patzke, Ron Nardi, and Dan Connors–all BioValve employees–attended a meeting with Abbott employees in Illinois. (Davis Aff. ¶¶ 11, 20.) At the March 2006 meeting, Plata reported on the progress of the project; he made no mention of any Abbott facility other than North Chicago. (Plata Aff. ¶¶ 10-11.) Pritts also participated in the meeting on Abbott's behalf. (Pritts Aff. ¶ 9.) According to Pritts, the parties discussed and verbally agreed on "final API specifications that would be used to test and release the DAR-0100 that was being produced." (*Id.* ¶ 10; *see also* Davis Aff. ¶ 21.) In an e-mail message dated April 6, BioValve ultimately approved the specifications that the parties had discussed in the March 29 meeting. (Davis Aff. ¶ 22.)

On April 30, 2006, Davis advised BioValve employees that the synthesis of DAR-0100 was complete, though it is not clear by what means this information was communicated. (Davis Aff.

---

[3] Davis' and Plata's affidavits list the date of the audit as January 9, 2005, but given the chronology of the events, the court assumes that this was a typographical error.

¶ 24.) At BioValve's request, the product was packaged in 100-gram portions, in amber glass bottles, and refrigerated in Abbott's North Chicago facility. (*Id.* ¶ 25.) Also at BioValve's request, on May 8, 2006, Davis sent BioValve a report comparing the analytical methods used at Abbott with the "old" methods used. (*Id.* ¶ 23.) At the end of that month, Davis advised BioValve (though again, it is not clear by what means) that the product was tested and approved for shipment. (*Id.* ¶ 26.) Davis then contacted Huie by telephone and e-mail to receive shipping information, but she never obtained the information from Huie or BioValve. (*Id.* ¶ 27.) According to Gonnelli, BioValve "recently" instructed Abbott to ship the first shipment of DAR-100A to BioValve's Massachusetts facility. (Gonnelli Aff. ¶ 11.)

On June 23, 2006, O'Keefe sent an invoice to Carter at BioValve, which requested payment of $590,000 for "API GMP with Certificate of Analysis" and $96,777 for "Raw/Starting Materials." (Ex. 3 to O'Keefe Aff., Invoice dated 6/23/06.) The invoice does not reference DAR-0100 by name, but the parties agree that the only purchase order or contract between BioValve and Abbott relates to the DAR-0100 project. This June 23 invoice, however, was later modified. After negotiations with Gonnelli, on September 26, 2006, O'Keefe sent a replacement invoice to Carter, which requested payment of $590,000 for API GMP with Certificate of Analysis but requested no payment for starting materials. (O'Keefe Aff. ¶¶ 9-10; Ex 2 to O'Keefe Aff., Invoice dated 9/26/06.) According to BioValve, on June 20, 2007, the parties reached a settlement agreement (though it is not clear where the parties negotiated or signed the agreement) resolving the outstanding payments due to Abbott. (Def.'s Mem. at 3 n.1.) BioValve made the first payment due under the parties' settlement agreement, for an amount not disclosed to the court, but it has run into financing difficulties in connection with the second payment, thus prompting this litigation. (*Id.*)

## DISCUSSION

**I.      Rule 12(b)(2)**

Rule 12(b)(2) permits a court to dismiss a complaint for "lack of personal jurisdiction." To successfully oppose a Rule 12(b)(2) motion, a plaintiff bears the burden of demonstrating that the court has personal jurisdiction over the defendant. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). A plaintiff need only make a *prima facie* showing that personal jurisdiction exists, so long as no material facts are in dispute. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). If, however, any material facts are disputed, the court must hold an evidentiary hearing to resolve those facts. *Id.* In this case, there are no material facts in dispute. As discussed above, the only dispute of fact the court has identified relates to whether Nichols was a BioValve employee and, as it is not material, no evidentiary hearing is necessary in this case.

## II.    Personal Jurisdiction

### A.    Legal Standard

As a federal district court exercising diversity jurisdiction, this court has personal jurisdiction over BioValve only if an Illinois state court would have personal jurisdiction. *RAR, Inc.*, 107 F.3d at 1275. Thus, the court has jurisdiction over BioValve if its exercise of jurisdiction comports with state statutory law, state constitutional law, and federal constitutional law. *Id.* at 1276. Although this principle suggests that there are three independent personal jurisdiction inquiries, Illinois' long arm statute provides that a court may "exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209©. The Illinois long arm statute "authorizes personal jurisdiction to the constitutional limits," and therefore "the three inquiries mentioned above collapse into two constitutional inquiries--one state and one federal." *RAR, Inc.*, 107 F.3d at 1276. In *Rollins v. Ellwood*, 141 Ill. 2d 244, 275, 565 N.E.2d 1302, 1136 (1990), the Illinois Supreme Court held that the federal and state due process inquiries are different for personal jurisdiction purposes. But the Seventh Circuit has recognized that once the federal and state due process inquiries are compared, it is clear that "there is no operative difference between the limits imposed by the Illinois Constitution and the federal

7

limitations on personal jurisdiction."  *Hyatt Int'l*, 302 F.3d at 715 (citing *RAR, Inc.*, 107 F.3d at 1276; *Klump v. Duffus*, 71 F.3d 1368, 1371 n.4 (7th Cir. 1995)).  Although the state and federal due process inquiries might, hypothetically, differ, the court can see no reason to believe they would under the circumstances of this case, and the parties have identified none.  *Id.*; *see also Kostal v. Pinkus Dermatopathology Lab., P.C.,* 357 Ill. App. 3d 381, 388, 827 N.E.2d 1031, 1037 (1st Dist. 2005) (court could not find any post-*Rollins* cases "where the requirements of federal due process were deemed to be met, but Illinois' due process requirements were not").  Accordingly, the inquires of federal and state due process are effectively identical, and the court need only conduct a single due process inquiry to determine whether it has personal jurisdiction.  *Edelson v. Ch'ien*, 352 F. Supp. 2d 861, 866 (N.D. Ill. 2005).

The Supreme Court has explained that, to satisfy the federal due process inquiry, the defendant must have "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted).  These minimum contacts must be sufficient to create a "substantial connection" between the defendant and the forum state. *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 109 (1987) (citation omitted).  While assessing whether these minimum contacts exist, the court must also inquire into the equities of asserting personal jurisdiction.  A corporate defendant has minimum contacts with the state if it would be reasonable "to require the corporation to defend the particular suit which is brought there." *Int'l Shoe*, 326 U.S. at 317.  In other words, the lawsuit must be foreseeable, which for purposes of a federal due process analysis, requires that "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  Thus, the defendant's minimum contacts "must come about by *an action of the defendant purposefully directed toward the forum State*."  *Asahi*, 480 U.S. at 112

(citation omitted) (emphasis in original).  Put another way, these minimum contacts support the exercise of personal jurisdiction if they constitute "purposeful[] avail[ment] . . . of the privilege of conducting activities within the forum State," such that the corporation "has clear notice that it is subject to suit there. . . ."  *Burger King*, 471 U.S. at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

In addition, the Supreme Court has distinguished between "general" jurisdiction and "specific" jurisdiction.  *Hyatt Int'l*, 302 F.3d at 713 (citing *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 nn. 8, 9 (1984)) (additional citations omitted).  General jurisdiction exists where a defendant has "continuous and systematic" contacts with the state in question.  *Id.*  Specific jurisdiction exists "for controversies that arise out of or are related to the defendant's forum contacts."  *Id.*  There is no allegation that BioValve had contacts with the state of Illinois apart from the contract at issue in Abbott's Complaint.  Accordingly, only specific jurisdiction is at issue in this case.

### B. BioValve's Contacts with Illinois

As a threshold matter, the court agrees with BioValve that it is not subject to personal jurisdiction in Illinois merely because it entered into a contract with an Illinois resident.  *See Prime Leasing, Inc. v. Jackson-Madison Cty. Gen. Hosp. Dist.*, No. 91 C 5726, 1992 WL 80410, at *7 (N.D. Ill. Apr. 7, 1992) (citing *Maurice Sternberg, Inc. v. James*, 577 F. Supp. 882, 885 (N.D. Ill. 1984)).  BioValve is also not subject to personal jurisdiction in Illinois solely because Abbott's performance of the contract occurred in Illinois.  *See Giacobbe v. Speiser, Krause, Nolan & Granito*, No. 05 C 4763, 2006 WL 2494750, at *4 (N.D. Ill. Aug. 23, 2006) (citing *Lakeside Bridge & Steel Co. v. Mtn. State Constr. Co.*, 597 F.2d 596, 603 (7th Cir. 1979)).  Although BioValve clearly became aware that Abbott was conducting work related to the DAR-0100 project in Illinois at some point after it submitted the Purchase Order to Abbott, there is no evidence or argument that it knew the contract would be performed in Illinois.  Perhaps if there were evidence that BioValve knew

during contract negotiations that Abbott would work on the project in Illinois, if the contract explicitly contemplated that Abbott's performance of the work in Illinois was likely, and if the contract anticipated that costs would be incurred in Illinois, Abbott's performance in Illinois might be a significant consideration. *See Citadel Group, Ltd. v. Merle W. Med. Ctr., Inc.*, No. 06 C 6162, 2007 U.S. Dist. LEXIS 43576, at *17-18 (N.D. Ill. June 13, 2007). But there is no evidence that BioValve was aware of such facts, and the court therefore turns to the conduct that is more relevant to this dispute.

### 1. Communications

BioValve argues that its telephone and e-mail communications with Abbott do not merit an exercise of personal jurisdiction. These communications, however, were significant and occurred over a long period of time. BioValve never contests that it reviewed and proposed changes to the proposal Abbott originally sent to DarPharma in the spring of 2005. Although neither party makes clear where the review or revisions occurred, these activities demonstrate that BioValve was at least in indirect contact with Abbott regarding the project in 2005. In addition, in 2005, BioValve communicated directly with Abbott regarding the Purchase Order. BioValve affirmatively acknowledges that, in January 2006, after Fernandes resigned, Abbott and BioValve began communicating directly and substantively regarding the project. (Def.'s Reply at 2.) Specifically, Davis and Huie communicated by phone and e-mail to set up the January 2006 meeting and audit. (Davis Aff. ¶¶ 16-17.) In the spring of 2006, Davis also communicated with BioValve regarding the status of the project, the analytical methods developed for the project, and shipping the completed product. (*Id.* ¶¶ 23-24, 26-27.) Meanwhile (and long before Fernandes resigned), Abbott and BioValve communicated regarding financial logistics. In July 2005, Abbott Senior Financial Analyst O'Keefe communicated by e-mail and telephone with BioValve employee Carter regarding a purchase order for the DAR-0100 project. (O'Keefe Aff. ¶¶ 4-5.) In June 2006, O'Keefe sent an invoice to Carter. (*Id.* ¶ 8.) O'Keefe and Gonnelli negotiated regarding this invoice, ultimately

resulting in O'Keefe issuing a replacement invoice and approving a payment schedule. (O'Keefe Aff. ¶¶ 9-10, 12.)

Isolated telephone and e-mail communications, alone, may not be a basis for asserting personal jurisdiction over BioValve. *See Delcon, Inc. v. Robert McMullan & Son, Inc.*, No. 85 C 4220, 1985 WL 5048, at *3 (N.D. Ill. Dec. 20, 1985) ("Interstate telephone and mail communications to an Illinois plaintiff are not sufficient to support jurisdiction over a nonresident defendant."). But Seventh Circuit and Supreme Court precedent limit the principle articulated in *Delcon*, enabling the court to consider telephone and e-mail communications when viewing a defendant's contact with the forum state "collectively." *Mid-Am. Tablewares v. Mogi Trading Co.*, 100 F.3d 1353, 1361 (7th Cir. 1996). Sustained contact over the course of several months, as existed between Abbott and BioValve, is "not random, fortuitous, or attenuated." *Id.* Even if the contact takes place by telephone or e-mail, it may create a substantial connection between the defendant and the forum state: "It is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. . . ." *Id.* (citing *Burger King*, 471 U.S. at 476). BioValve employees' review of electronic versions of Abbott's proposal, e-mails regarding the Purchase Order for the project, telephone conversations to set up meetings with Abbott in Illinois, approval of specifications by e-mail, and requests for packaging and storage of the product are therefore relevant to paint an overall picture of BioValve's contacts with Illinois.

### 2. Physical Presence

Moreover, there is no dispute that BioValve employees visited the Abbott facility in North Chicago, Illinois on two occasions. (*See* Gonnelli Aff. ¶ 10.) Arguing that these two visits should not lead the court to exercise personal jurisdiction, BioValve points the court to three cases from this district in which a non-resident's trips to Illinois were deemed insufficient to establish personal

jurisdiction of a district court. In the first case, the non-resident defendant made two visits to Illinois. The defendant's first visit–to an art gallery with whom he later entered a contractual relationship–was made while he was in Illinois for other purposes, and the parties did not negotiate during his visit. *Maurice*, 577 F. Supp. at 886. Instead, the defendant visited the gallery because he was curious about its art. *Id.* The defendant's second visit was a "closer question," but the court noted that defendant did not come to Chicago merely to visit the gallery, and that, at best, he spent thirty to sixty minutes "engaged in negotiations by suggesting combinations of his paintings to be traded for plaintiff's painting." *Id.* But the plaintiff ultimately rejected any of the defendant's offers that resulted from that visit. *Id.* The *Maurice* court therefore found that "this second visit, even when considered together with the first visit, could not be characterized as substantial negotiation and thus does not meet the jurisdictional requirements for transacting business." *Id.*

Similarly, in the second case BioValve cites, *Delcon*, the non-resident visited Illinois to negotiate a contract, but those negotiations were probably non-substantial and, in any case, resulted only in the non-resident making an offer that the plaintiff rejected. 1985 WL 5048, at *3. His travel to Illinois was therefore insufficient to merit an exercise of specific personal jurisdiction. *Id.* In the last case BioValve cites (notably decided in 1968, before many governing personal jurisdiction cases were decided), the defendant's one visit to Illinois was made "to find out whether the contract in dispute could be serviced more efficiently," but there is no indication that the defendant's sales manager, who made the trip, settled on any changes to service of the contract, or whether those changes were adopted. *Nat'l Television Sales, Inc. v. Philadelphia Television Broad. Co.*, 284 F. Supp. 68, 69-70 (N.D. Ill. 1968). In other words, again, no successful contract negotiations occurred during the sales manager's visit to Illinois. Essentially, *Maurice*, *Delcon*, and *National Television* stand for the unassailable principle that in order to merit an exercise of personal jurisdiction, the non-resident defendant's minimum contacts with the forum state must create a "substantial connection" between the defendant and the forum state. *Asahi*, 480 U.S. at 109.

12

Illinois courts appear to hold that a visit to Illinois does not establish a substantial connection to the state if it is incidental to the contract at issue, or if any substantive negotiations that occur during the visit fail to result in a contract between the parties.

Neither doctrine is at issue in this case. BioValve's visits to Illinois were substantive, directly related to performance under the contract (rather than undertaken because of artistic curiosity), and successfully determined project specifications: First, the BioValve employees clearly came to Illinois in connection with the DAR-0100 project and performed substantial work related to it. In January 2006, Huie and Patzke visited Abbott, in Huie's words, to "review the status of the DAR 100A synthesis" and to "audit the facility and procedures and review specifications based on [Abbott's] small batch run results." (E-mail from Huie to Davis without identifying header information.) Huie and Patzke intended to meet with Abbott for at least five hours; Huie suggested that they meet on January 9 from 12 p.m.-5 p.m., and for an additional three hours on January 10, if necessary. (*Id.*) While Huie's e-mail suggests that the BioValve employees had other business purposes for visiting Illinois, the trip to Abbott served a substantial purpose related to the DAR-0100 project. Significantly, during this visit, Huie and Patzke undertook serious investigation and discussion related to the project's performance, status, and timeline with the Abbott team. They also conducted the requested "customer audit" of Abbott's North Chicago facility, and prepared a detailed report. (Davis. Aff. ¶ 18.) Unlike the defendant's first visit in the *Maurice* case, Huie's and Patzke's trip to Illinois was directly related to Abbott's performance under the contract.

In March 2006, Huie and Patzke traveled to Illinois again, this time with Nardi and Connors. (Davis Aff. ¶ 20.) BioValve's president and CEO attested that the meeting was necessary because Abbott was having difficulty producing DAR-100A, and BioValve employees came to the facility to provide assistance in order "to ensure that the final product would still meet Biovalve's requirements." (Gonnelli Aff. ¶ 10.) During the March 2006 meeting, Abbott and BioValve "discussed and agreed upon the final specifications on DAR-0100." (Davis Aff. ¶ 21.) BioValve

13

ultimately approved those specifications in April 2006, via e-mail.  (*Id.* ¶ 22.)  In other words, this is not a situation, as in *Maurice* and *Delcon*, where the negotiations during defendant's visit were ultimately cast aside and thus irrelevant.  Instead, they were, according to Davis' uncontradicted-representations, the basis on which Abbott proceeded with the project.  Thus, the cases BioValve has collected do not speak to the question of whether personal jurisdiction exists in this case.

*Wisconsin Electrical*, a case not cited by the parties, is instructive.  *Wisc. Elec. Mfg. Co. v. Pennant Prods., Inc.*, 619 F.2d 676, 678 (7th Cir. 1980).  In that case, the Seventh Circuit reversed a dismissal, concluding that Illinois courts have personal jurisdiction over a non-resident defendant if the defendant conducted activities in the forum state that "were significant in the formation of the contract and [defendant's] efforts to have it satisfactorily performed." *Id.*  In *Wisconsin Electrical*, the court found that the district court had personal jurisdiction over a defendant who visited the forum state once during contract negotiations and once more to negotiate with the plaintiff regarding contract performance.  *Id.*; *see also Uarco, Inc. v. Viguerie Co.*, 618 F. Supp. 1470, 1472 (N.D. Ill. 1985) (exercising personal jurisdiction where, among other factors, "[d]uring the course of the contract's performance, [defendant] made four trips to Illinois to review the performance of [plaintiff's] work . . . [and] toured [plaintiff's] Illinois plant.").  In other words, the *Wisconsin Electrical* visits were substantial rather than incidental to the contract.  In addition to being significant, BioValve's visits to Illinois were explicitly made–as both Gonnelli and Huie have acknowledged–for the purpose of evaluating and improving Abbott's contract performance, thereby underscoring the reasonableness considering those visits as a basis for the exercise of personal jurisdiction.  *See F. McConnell & Sons, Inc. v. Target Data Sys., Inc.*, 84 F. Supp. 2d 961, 968 (N.D. Ind. 1999) ("a defendant's visits to the forum state to check on or assist in the performance of a contract demonstrate the requisite purposeful availment of the privilege to conduct business in the forum state.").  Thus, BioValve's trips to Illinois to ensure successful performance of the DAR-0100 project support the court's exercise of personal jurisdiction.

BioValve contends that cases in which a defendant solicits a contract are not comparable to cases in which the defendant merely accepts the solicitation. But courts have rejected this distinction as dispositive where a non-resident defendant visited the forum state in connection with contract performance. *United States Gypsum Co. v. All Tank Sales & Supply Co.*, 977 F. Supp. 1340 (N.D. Ill. 1997). In *Gypsum*, the plaintiff ("USG") sent a bid request to the non-resident defendant ("All Tank"). *Id.* at 1341-42. All Tank then submitted a bid, USG accepted it, and USG drafted a contract, which both parties signed. *Id.* at 1342. Later, All Tank sent USG a letter nullifying the contract, prompting litigation. *Id.* The district court found that it had personal jurisdiction over All Tank, noting that All Tank had communicated with USG's Chicago office several times during contract negotiations. *Id.* at 1343. In addition, after the contract was signed, All Tank's president had traveled to Illinois to discuss issues related to the project and, while in Illinois, made promises that were the basis for one count of USG's complaint. *Id.* The court held: "Although [plaintiff] solicited [defendant] for the bid, and the contract was not negotiated, executed, or performed in Illinois, [defendant]'s visit to Illinois during the course of performance is a significant contact with the state." *Id. See also Citadel Group Ltd. v. Wash. Reg'l Med. Ctr.*, No. 07 C 1394, 2007 WL 1772262, at *3 (N.D. Ill. June 18, 2007) ("Ultimately, 'pinning down which party initiated the transaction is merely one helpful factor in the jurisdictional equation,' and we do not find it particularly helpful, here.") (quoting *Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 53 (7th Cir.1996)) (additional citation omitted).

Of course, physical presence in Illinois is neither necessary nor sufficient to subject a non-resident to personal jurisdiction. *Wisc. Elec.*, 619 F.2d at 678 nn. 6 & 8. But in this case, BioValve's physical presence in Illinois was a significant contact with Illinois. *Id.* at 678; *Gypsum*, 977 F. Supp. at 1343; *Uarco*, 618 F. Supp. at 1472. Moreover, these visits were intended to ensure that the DAR-0100 contract was performed to BioValve's satisfaction, and therefore purposefully availed BioValve of the privilege to conduct business in Illinois. *F. McConnell*, 84 F. Supp. 2d at

968. Accordingly, BioValve's two visits to Illinois, particularly considered alongside BioValve's ongoing communication with Abbott's Illinois facilities and employees, all related to the negotiation and performance of the DAR-0100 contract, merit an exercise of personal jurisdiction.

### 3. Regular Business Connections

BioValve urges that it was not conducting regular business in Illinois. In this case, however, only specific jurisdiction is at issue; thus, the court "only analyzes those contacts from which the cause of action arises." *Edelson*, 352 F. Supp. 2d at 867-68; *see also Kostal*, 357 Ill. App. 3d at 385, 827 N.E.2d at 1035 (distinguishing the "doing business" theory of personal jurisdiction, which subjects a corporation to general jurisdiction, from the "transacting business" theory, which subjects the corporation to specific jurisdiction). That BioValve does not conduct regular business in Illinois cannot counteract the fact that, in relation to this transaction, its employees did communicate with Abbott and visit the Abbott facility in Illinois to investigate performance of the contract and negotiate specifications.

### C. Fairness

Finally, a due process inquiry also requires considering the equities of exercising personal jurisdiction. When doing so, Illinois courts treat active purchasers and passive purchasers differently. *Ruprecht Co. v. Sysco Food Servs. of Seattle, Inc.*, 309 Ill. App. 3d 113, 122, 722 N.E.2d 694, 701 (1st Dist. 1999) ("distinction between passive and active purchasers also applies to whether it is fair, just, and reasonable to assert jurisdiction over a nonresident defendant"). Although the parties do not directly discuss this principle, this fairness inquiry is precisely the place where the Illinois Constitution might afford broader due process guarantees than the federal Constitution. *See Rollins*, 141 Ill. 2d at 275, 565 N.E.2d at 1316 (Illinois courts keep "concern for fairness uppermost in our mind" when deciding whether personal jurisdiction exists).

A passive purchaser "merely places an order" for goods, accepting the terms proposed by the seller, and is not typically subject to personal jurisdiction. *Id.* at 121, 722 N.E.2d at 700 (quoting

*Chalek v. Klein*, 193 Ill. App. 3d 767, 773, 550 N.E.2d 645, 649 (2d Dist. 1990)). An active purchaser, on the other hand, dictates or vigorously negotiates contract terms, or inspects production facilities. *Id.* (quoting *Chalek*, 193 Ill. App. 3d at 773, 550 N.E.2d at 649). As a result, "the unfairness which would be associated with the exercise of long arm jurisdiction over that buyer dissipates, and he or she will be subject to personal jurisdiction in the courts of the seller's State." *Id.* (quoting *Chalek*, 193 Ill. App. 3d at 773, 550 N.E.2d at 649). The relevant evidence demonstrates that BioValve was what Illinois courts deem an active purchaser. BioValve's active role in the transaction included reviewing draft proposals sent to DarPharma, inspecting and conducting an audit of Abbott's Illinois facilities, negotiating the project's final specifications, and requesting a reduction in the invoice submitted to it. "As *Ruprecht* and like cases have held, an out-of-state purchaser that might otherwise claim insulation from the assertion of personal jurisdiction in Illinois . . . cannot advance that position successfully where that purchaser has itself tailored and dictated the specifications for its purchases from the Illinois seller." *Drivecon Corp. v. Hoist & Crane Serv. Group*, 196 F. Supp. 2d 688, 690 (N.D. Ill. 2001). The court therefore concludes that the exercise of personal jurisdiction over BioValve does not offend due process guarantees of either the federal or the Illinois state constitution.

## CONCLUSION

For the reasons explained above, Defendant's motion to dismiss (14) is denied.

ENTER:

Dated: February 12, 2008

_____
REBECCA R. PALLMEYER
United States District Judge